WO

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Joseph R. Estrella, III,

Plaintiff,

v.

Erick Selvius, et al.,

Defendants.

No. CV-25-00420-PHX-JAT (CDB)

**ORDER**

Pro se Plaintiff Joseph R. Estrella, III, who is currently confined in the Arizona State Prison Complex-Tucson, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants Erick Selvius and Mark McKnight move for summary judgment on the merits of Plaintiff's Fourth Amendment excessive force claim and on qualified immunity grounds. (Doc. 26). Plaintiff was informed of his rights and obligations to respond pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) (Doc. 29), and he opposes the Motion. (Doc. 31). Defendants filed a Reply in support of the Motion. (Doc. 33).

## I. Background

In the Complaint, Plaintiff sued Phoenix Police Department Sergeant/Detective Erick Selvius, Officer/Detective Mark McKnight, and the "Current Police Chief." (Doc. 1). Plaintiff alleged that Defendants Selvius and McKnight used excessive force against him, and the "Current Police Chief" failed to adequately train Defendants Selvius and McKnight. (*Id.*). On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated a Fourth Amendment excessive force claim in Count One against

Defendants Selvius and McKnight and directed them to answer the claim. (Doc. 5). The Court dismissed the remaining claims and Defendant. (*Id.*).

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

"A moving party without the ultimate burden of persuasion at trial . . . has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Id.* If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor"). The nonmovant need not establish a material issue of fact conclusively in its favor; "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248 (quoting *First Nat'l Bank of Ariz.*

*v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (the non-moving party must "come forward with specific facts showing that there is a genuine issue for trial") (internal citation omitted); Fed. R. Civ. P. 56(c)(1). To carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact. *Nissan Fire*, 210 F.3d at 1102.

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court usually must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. However, when there is video evidence, the Supreme Court held that the court need not believe self-serving testimony that is contradicted by the video evidence. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (holding that lower courts should view the facts in the light depicted by the clear video tape, rather than crediting a version of the facts that is clearly contradicted by the video tape). Finally, the court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Facts

The Court will set forth each party's version of the events, the relevant documentary evidence, and the Court's review of the body worn camera footage.

### A. Defendants' Facts

On October 7, 2024, Defendants Selvius and McKnight observed Plaintiff making a hand-to-hand transaction consistent with the sale of narcotics at a bus stop near 3600 East Thomas Road in Phoenix. (Defs.' Statement of Facts (DSOF), Doc. 27 at 2 ¶¶ 3-4). After Plaintiff walked away from the bus stop, Defendants, driving in an unmarked truck, drove toward Plaintiff while he was walking through a parking lot after leaving the tattoo shop where he worked. (*Id.* ¶ 2). Defendants pulled up to Plaintiff, exited their vehicle, approached him, and identified themselves as police officers. (*Id.* ¶ 6). Defendants were wearing tactical vests with the word "POLICE" written in bold yellow letters. (*Id.* ¶ 7).

As Defendants approached Plaintiff, he took a "defensive" position by backing away, pulling up his pants, and raising his hands "like he was ready to fight." (*Id.* ¶ 8). Plaintiff had "objects" in both his hands. (*Id.* ¶ 9). Defendant Selvius instructed Plaintiff multiple times to get on the ground, but Plaintiff did not comply. (*Id.* ¶ 10). Defendant Selvius pushed Plaintiff off balance to get him to the ground. (*Id.*). After Plaintiff "went to the ground," he tried to get up. (*Id.*). Defendant McKnight struck Plaintiff once with a closed, empty fist, in his face to "disrupt his cognitive ability." (*Id.* ¶ 12). At that point, Plaintiff was handcuffed. (*Id.* ¶ 13). No other strikes were delivered to Plaintiff's person, and no force was used against him after he was handcuffed. (*Id.* ¶¶ 14-15).

Officers recovered narcotics from Plaintiff after a search incident to arrest, and Plaintiff ultimately pleaded guilty to possession of narcotics. (*Id.* ¶¶ 17-18).

**B. Plaintiff's Facts**

On October 7, 2024, Defendants, "out of nowhere jumped out of an unmarked police car," and Defendant Selvius shoved Plaintiff while Defendant McKnight punched him multiple times. (Pl.'s Statement of Facts (PSOF), Doc. 32 at 5). Defendants did not identify themselves as police officers before they used force against Plaintiff, and Plaintiff did not hear Defendants identify themselves as police. (*Id.*). Plaintiff did not take a defensive or aggressive posture and was "shocked and startled" when Defendants "jumped out of their unmarked car," which is why he "put his hands up." (*Id.*). Plaintiff tried to comply with Defendants' commands, but Defendants gave Plaintiff no time to comply before using force. (*Id.* at 6-7). Defendant McKnight punched Plaintiff multiple times, causing injuries. (*Id.* at 6).

**C. Incident Reports**

Defendants each wrote Incident Reports following Plaintiff's arrest. Defendant Selvius's report states that on October 7, 2024, Defendants Selvius and McKnight were conducting surveillance in the Walgreen's parking lot south of the bus stop at 3600 East Thomas Road "to follow up on complaints of illegal activity adversely affecting the bus stop in the area." (Doc. 31 at 20). Defendant Selvius wrote that East Thomas Road had

become "increasingly busy with illegal activity consisting of drug use, drug sales, and violent crimes." (*Id.*). Defendant Selvius stated that he was parked to the south watching a group of people standing in the parking lot just south of the bus stop and observed Plaintiff standing in the parking lot on an island curb. (*Id.* at 20-21). Defendant Selvius wrote that Plaintiff "had subjects walking up to [him], briefly interacting and then walking away," which "can be consistent with drug sales." (*Id.* at 21). Defendant Selvius stated that he parked "just west" of where Plaintiff was standing and used binoculars with an "unobstructed view." (*Id.*). Defendant Selvius wrote that he and Defendant McKnight observed Plaintiff engage in "two hand-to-hand transactions where subjects walked up to [Plaintiff,] handed him money and in return he dropped blue M30 pills into their hand that he had in [a] small prescription bottle." (*Id.*). Defendant Selvius stated that Plaintiff "appeared to be on high alert as he looked all around scanning the parking lot." (*Id.*). Defendant Selvius wrote that he and Defendant McKnight waited for Plaintiff "to create some sep[a]ration from the others around him," and Plaintiff walked away slowly to the east in the parking lot. (*Id.*). Defendant Selvius stated that he drove around to Plaintiff's position in the parking lot, and Plaintiff "turned around and began walking back to where he was standing." (*Id.*). Defendant Selvius wrote that he and Detective McKnight exited the vehicle wearing vests that said "Police" on the front in large lettering. (*Id.*). Defendant Selvius stated that he was in plainclothes, and Detective McKnight was in uniform. (*Id.*).

Defendant Selvius wrote that Plaintiff "began back pedal[]ing and then took a defensive posture and started hopping pulling his pants up and raising his hands like he was ready to fight." (*Id.*). Defendant Selvius stated that he told Plaintiff to get on the ground three times, and Plaintiff "had objects in both hands," but Defendant Selvius "did not know what he was holding onto." (*Id.*). Defendant Selvius wrote that Plaintiff "brought his arms back down to his side again by his waistband and slightly turned away." (*Id.*). Defendant Selvius stated that he thought Plaintiff was "reaching for a handgun" because of his "body language" and "how he was acting." (*Id.*). Defendant Selvius wrote that he "extended both arms out and pushed [Plaintiff] off balance," and after Defendant Selvius

pushed him, Plaintiff fell backward, "put his legs up in another defensive posture," and "tried spinning on his back in an attempt to get back up off the ground." (*Id.*). Defendant Selvius stated that Detective McKnight "delivered one closed empty fist strike to [Plaintiff's] face to disrupt his cognitive ability," and both Defendants "moved in to control [Plaintiff's] arms to prevent him from reaching around." (*Id.*). Defendant Selvius wrote that they rolled Plaintiff onto his stomach and detained him with handcuffs to the rear. (*Id.*). Defendant Selvius stated that Plaintiff "had a small area to his [forehead] where he had some swelling although he did not have any complaints of injury." (*Id.*).

In his Incident Report, Defendant McKnight wrote that Plaintiff was near the driver's side where Defendant Selvius had exited, and once Defendant McKnight was "in a direct line of sight," he yelled, "Phoenix police." (*Id.* at 30). Defendant McKnight stated that he heard Defendant Selvius giving commands to Plaintiff, and as Defendant McKnight "ran up," he observed Plaintiff "drop his arms down to his side" and "cl[ench] his fists." (*Id.*). Defendant McKnight wrote that Plaintiff "started jumping up and down in a manner [McKnight] believed [] was taking a fighting posture." (*Id.*). Defendant McKnight stated that he believed Plaintiff was "getting ready for a fight." (*Id.*). Defendant McKnight wrote that as Defendant Selvius "closed the distance," Defendant McKnight was right behind him, and Plaintiff "began pedaling and blading his body quickly." (*Id.*). Defendant McKnight stated that he observed Plaintiff "raise his left arm and his right leg in a kicking motion towards" Defendant Selvius, and Defendant Selvius "continued to give commands." (*Id.*). Defendant McKnight wrote that Defendant Selvius pushed Plaintiff to "get him off balance," and Plaintiff "fell backwards on [the] ground" but "lifted his legs up." (*Id.*). Defendant McKnight stated that Plaintiff's "hands were still fisted and were also up in another ground fighting position," and "due to the unknowns of [Plaintiff] and possibility of weapons on his person[,] it was believed he may have had a weapon." (*Id.*). Defendant McKnight wrote, "It should be noted that drug dealers commonly carry a variety of weapons to include knives, blunt objects and firearms on their person for protection." (*Id.*). Defendant McKnight stated that he believed Plaintiff "may have been reaching for

something near his left side of his waist." (*Id.*). Defendant McKnight wrote that as he "made contact with" Plaintiff, his back was toward Defendant McKnight, and Plaintiff was on the ground. (*Id.*). Defendant McKnight stated that he "delivered one closed empty fist strike to the right side of [Plaintiff's] face" to "disrupt his central nervous system from acting further in any physical harm toward [Defendants]." (*Id.*). Defendant McKnight's report states that a knife was found during the search of Plaintiff's person, but there is no description of the knife. (*Id.*).

**D. Video Evidence**

The video evidence consists of Defendants' McKnight and Selvius's body worn camera footage. (McKnight Body Worn Camera Footage ("McKnight"), Doc. 27, Exh. D; Selvius Body Worn Camera Footage ("Selvius"), Doc. 27, Exh. E).

Defendant Selvius's body worn camera footage shows Defendant Selvius sitting in the driver's seat of the unmarked truck with only the dashboard visible on the footage. (Selvius at 00:03). The time on the body worn camera is 8:18 p.m. (*Id.*). After about 40 seconds, Selvius begins to drive and stops about 25 seconds later. (*Id.* at 00:43-01:07). Defendant Selvius quickly exits the truck in a parking lot a few feet from Plaintiff and says "Get on the ground, dude." (*Id.* at 01:07-01:10). No announcement or other warning can be heard on Defendant Selvius' body worn camera footage. (*Id.*). Plaintiff has something in his right hand and is wearing a medium sized bag around his waist. (*Id.* at 01:10-01:12). Plaintiff puts both hands in front of the bag he is wearing in front of his waist then puts both arms at his sides. (*Id.* at 01:11). Plaintiff says, "I didn't do nothing" as he hops/skips backward from Defendant Selvius' reach, and Defendant Selvius says, "Get on the ground, get on the ground." (*Id.* at 01:11-01:13). Defendant Selvius forcefully shoves Plaintiff, Plaintiff falls backward onto the ground, and his body spins with his legs elevated. (*Id.* at 01:13-01:14). Plaintiff rolls over and sits up halfway with his back to Defendant Selvius as Defendant Selvius says, "Get on the [] ground, you can't listen or what?" (*Id.* at 01:14-01:15).

Defendant McKnight appears and says "Get on the ground," and Defendants Selvius and McKnight push Plaintiff down. (*Id.* at 01:14-01:16). The moment that Defendant McKnight strikes Plaintiff in the face is not clear from the footage. Defendant McKnight pushes Plaintiff's head onto the ground as Defendant Selvius pulls Plaintiff's arms behind Plaintiff's back. (*Id.* at 01:17). Defendant McKnight says, "You don't [] listen real good." (*Id.* at 01:19). Plaintiff is grunting and moaning as he is handcuffed. (*Id.* at 01:19-01:22). Defendant McKnight says, "Trying to throw up your hands like you want a [] fight." (*Id.* at 01:30). Defendant Selvius says "out here dealing in broad daylight." (*Id.* at 01:38). Less than 20 seconds elapse from the moment when Defendant Selvius exits the police truck to when Defendants handcuff Plaintiff.

Defendants search Plaintiff's pockets and ask him if he has any weapons and if he has ID. (*Id.* at 01:30-02:14). Plaintiff says his ID is in his wallet. (*Id.*). Plaintiff also appears to say "I've got a knife." (*Id*. at 1:38-1:39). Plaintiff asks, "Why you punch me dawg?" (*Id.* at 02:14). Defendant Selvius says, "Why were you resisting arrest?" (*Id.* at 02:14-02:19). Plaintiff says something about a robbery and that he got robbed, and Defendant Selvius says, "Oh, you don't see my vest dude?" (*Id.* at 02:25). Plaintiff says, "It just didn't dawn to me you know." (*Id.* at 02:25). Defendant McKnight says, "Yeah we said Phoenix Police." (*Id.* at 02:27).

Defendant McKnight's body worn camera footage begins with Defendant McKnight in the passenger's seat of the unmarked truck. (McKnight at 1:07). Defendant McKnight exits the truck and runs toward Defendant Selvius and Plaintiff. (*Id.* at 01:07-01:14). Defendant McKnight says "Phoenix police" while he is running toward Defendant Selvius and Plaintiff. (*Id.* at 1:13–1:14). As Defendant McKnight approaches, Defendant Selvius says, "You can't listen or what?" and Defendant McKnight tells Plaintiff, "Get on the ground." (*Id.* at 01:16). Defendants try to get Plaintiff's arms behind his back. (*Id.* at 01:16-01:20). Defendant Selvius says, "police, man, you're under arrest" and handcuffs Plaintiff. (01:20-01:26).

## IV. Excessive Force

### A. Legal Standard

A claim that law enforcement officers used excessive force in the course of an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Id.* To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involve factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect is resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary. *Espinosa v. City & County of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396–97, and *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)). But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc).

/ / /

/ / /

### B. Parties' Arguments

#### 1. Defendants' Motion

In their Motion, Defendants argue the "type and amount of force used here was minimal and proportional" because Defendant Selvius pushed Plaintiff off balance to bring him to the ground after repeated commands were ignored, and Defendant McKnight "delivered a single, closed-fist strike to Plaintiff's face when Plaintiff continued to resist by attempting to get up off the ground." (Doc. 26 at 6). Defendants assert that "the amount of force used was narrowly tailored to the circumstances and proportionate to the need to gain control of a noncompliant, physically resistant suspect." (*Id.*).

Defendants next contend that the severity of the crime at issue weighs in their favor because Plaintiff was suspected of engaging in the sale of narcotics, a serious felony offense under Arizona law that is "also closely associated with violence, weapons, and heightened risks to officer safety during enforcement encounters." (*Id.* at 7). Defendants argue that "[u]nlike a minor or nonviolent offense, suspected narcotics distribution creates an inherently volatile situation where suspects may attempt to flee, destroy evidence, or resort to violence to avoid apprehension." (*Id.* at 8).

With respect to the threat Plaintiff posed to them, Defendants assert that a reasonable officer in their position "would have perceived Plaintiff as an immediate threat under the circumstances" because he "repeatedly refused to comply with lawful commands," even after Defendants "clearly identified themselves as Phoenix Police Officers and ordered him to get on the ground." (*Id.* at 9). Defendants argue that rather than comply, Plaintiff "backed away, adjusted his pants, and raised his hands in a manner suggesting he was prepared to fight." (*Id.*). Defendants contend that even after Defendant Selvius knocked Plaintiff off balance, Plaintiff "continued to resist by attempting to get back up." (*Id.*).

Defendants assert that "Plaintiff's conduct during the encounter was not passive or merely evasive, but active resistance." (*Id.* at 10). Defendants argue that Plaintiff did not "simply attempt to flee" but "demonstrated defiance and aggression." (*Id.*).

**2. Plaintiff's Response**

Plaintiff responds that he was arrested for possession of narcotic drugs for sale, "a non-violent offense that provides no inherent justification for the excessive use of force." (Doc. 31 at 4). Plaintiff asserts he was not detained for a violent crime, and Defendants did not state that they saw any weapons on Plaintiff's person. (*Id.* at 6). Plaintiff contends that Defendants "did not attempt to use de-escalation techniques such as the threat of the use of their taser through verbal commands" to achieve compliance and instead "immediately use[d] force." (*Id.* at 5-6). Plaintiff argues that in the circumstances, Defendants had "less intrusive alternatives available." (*Id.* at 6). Plaintiff maintains that Defendants' claim that he was actively resisting is false, and he "posed absolutely no threat" to Defendants. (*Id.* at 10). Plaintiff asserts that Defendants cannot "create the very need through their own actions and then use it as an excuse to use force." (*Id.* at 10-11). Plaintiff accuses Defendants of lying in their Declarations and committing perjury by swearing that Defendant McKnight only struck Plaintiff once. (*Id.* at 11). Plaintiff contends the bruising on his face "could only have occurred through multiple strikes and use of force" by Defendants. (*Id.*).

In his response, Plaintiff appears to limit his claims against Defendant Selvius to the pushing to the ground; and Plaintiff appears to limit his claims against Defendant McKnight to the punch or punches to the face. (*Id*. at 5).

**3. Defendants' Reply**

Defendants argue in their Reply that Plaintiff "cannot plausibly maintain that he was unaware the individuals approaching him were police officers" because Defendants approached him wearing tactical vests with the word "POLICE" prominently displayed in large, bright-yellow lettering across their chests, and Plaintiff admits that he heard Defendants yelling commands as soon as they exited their vehicle. (Doc. 33 at 3). Defendants assert that they used "only the level of force necessary to gain control of a noncompliant and physically resistant suspect," and whether Plaintiff did not hear

Defendant Selvius's commands or ignored them, "the outcome is the same: Plaintiff did not comply." (*Id.* at 4-5).

**C. Discussion**[1]

**1. Nature and Degree of Force Used**

The Court must first evaluate "the type and amount of force inflicted." *Espinosa*, 598 F.3d at 537 (quotation omitted). Generally, "quantifying a particular use of force requires consideration of the 'specific factual circumstances' surrounding the event." *Seidner v. de Vries*, 39 F.4th 591, 597 (9th Cir. 2022) (quoting *Lowry v. City of San Diego*, 858 F.3d 1248, 1259 (9th Cir. 2017) (en banc)). Police officers "are not required to use the least intrusive degree of force possible," but must act within a reasonable range of conduct. *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th Cir. 2012) (quotation marks omitted). Both "[t]he nature and degree of physical contact and the risk of harm and the actual harm experienced are relevant," *Seidner*, 39 F.4th at 597 (quoting *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1151 (9th Cir. 2022)) (internal quotation marks omitted), but "[t]he existence of an injury does not necessarily mean that a plaintiff's constitutional rights have been violated or that police officers used excessive force in arresting the plaintiff." *Griego v. County of Maui*, NO. 15-00122 SOM-KJM, 2017 WL 1173912, at *18 (D. Haw. Mar. 29, 2017).

It is undisputed that Defendant Selvius shoved Plaintiff to the ground. (McKnight Decl. ¶ 10; Selvius Decl. ¶ 10). The nature and quality of this intrusion is "'less significant than most claims of force.'" *Mehta v. City of Upland*, 748 F. App'x 739, 742 (9th Cir. 2018) (describing force exerted as aiming a gun at an arrestee, pulling him from his car, shoving him to the ground, and subsequently dragging him across the road) (quoting *Forrester v. City of San Diego*, 25 F.3d 804, 807-08 (9th Cir. 1994)) (describing the use of

---

[1] In his Statement of Facts, Plaintiff asserts that Defendants lacked reasonable suspicion to stop him or probable cause to arrest him. (PSOF at 3.) However, Plaintiff did not properly present this argument in his Response, and the Court will not address it.

pain compliance techniques on non-resisting abortion protestors, which resulted in bruises, a pinched nerve, and a broken wrist, as a "minimal" use of force).

The parties dispute whether Defendant McKnight struck Plaintiff in the face once or multiple times, but it is undisputed that Defendant McKnight struck Plaintiff in the face with a closed fist at least once. Closed fist strikes to the face are "capable of inflicting significant pain and causing serious injury, and as such are regarded as intermediate force that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests." *Coles v. Eagle*, 704 F.3d 624, 628 (9th Cir. 2012) (quoting *Young v. County of L.A.*, 655 F.3d 1156, 1162 (9th Cir. 2011)) (internal quotation marks omitted); *see also Felarca v. Birgeneau*, 1-cv-05719-YGR, 2016 WL 324351, at *11 (N.D. Cal. Jan. 27, 2016) ("[a] police officer's use of . . . punches with a closed fist" constitutes a "'significant use of force that is capable of causing pain and bodily injury, and therefore . . . are considered a form of intermediate force'") (citation omitted). On the spectrum of the severity of closed-fist strikes, Defendant McKnight's use of force was significant, if not "extremely severe." *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007). Defendant McKnight's use of force must be justified by a similar level of "government interest [that] compels the employment of such force." *See Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001).

**2. *Graham* Factors**

Next, the Court considers the *Graham* factors: the severity of the crime at issue, whether Plaintiff posed an immediate threat to the safety of the officers or others, and whether Plaintiff was actively resisting arrest or attempting to escape. "[T]hese factors are not exclusive; they must be considered under the totality of circumstances, including whether 'less intrusive alternatives' were available to law enforcement and whether the suspect was given 'proper warnings' before force was used." *Sabbe v. Wash. County Bd. of Comm'r*s, 84 F.4th 807, 822 (9th Cir. 2023) (quoting *Seidner*, 39 F.4th at 599). A court may also consider whether an officer failed to identify himself as a law enforcement officer. *See Nehad v. Browder*, 929 F.3d 1125, 1138 (9th Cir. 2019).

**a. Severity of the Crime**

"The character of the offense is often an important consideration in determining whether the use of force was justified." *Deorle*, 272 F.3d at 1280. An officer's use of force is evaluated in light of the crime that he was investigating. *Gabriel v. County of Sonoma*, 725 F. Supp. 3d 1062, 1073 (N.D. Cal. 2024) (citing *Rice v. Morehouse*, 989 F.3d 1112, 1123 (9th Cir. 2021)). "The government has an undeniable legitimate interest in apprehending criminal suspects, and that interest is even stronger when the criminal is . . . suspected of a felony, which is by definition a crime deemed serious by the state." *Miller*, 340 F.3d at 964 (internal citation omitted).

The Ninth Circuit Court of Appeals has "applied [the severity of crime] factor in two slightly different ways." *Nehad*, 929 F.3d at 1136. First, the Ninth Circuit has concluded that "a particular use of force would be more reasonable, all other things being equal, when applied against a felony suspect than when applied against a person suspected of only a misdemeanor." *Id.* Second, courts "use[ ] the severity of the crime at issue as a proxy for the danger a suspect poses at the time force is applied." *Id.*

Defendants argue that "drug-related offenses are generally considered serious crimes for purposes of excessive force analysis." (Doc. 33 at 6) (citing *Galindo v. City of San Francisco*, 718 F. Supp. 3d 1121, 1133 (N.D. Cal. 2024) ("[W]hen an individual is suspected of a felony, which is by definition a crime deemed serious by the state, the severity of the crime strongly favors the use of force by police officers"). Defendants suspected that Plaintiff had engaged in a felony narcotics transaction. Accordingly, in the first sense, the crime at issue was serious. *See Miller*, 340 F.3d at 964. But there is no evidence that Plaintiff committed a violent crime, or engaged in or was suspected of any violent behavior. In the second sense, the suspected crime was less serious.

On balance, the first *Graham* factor weighs slightly in favor of Defendants.

**b. Immediate Threat to Safety**

Next, the Court examines the "most important *Graham* factor": whether Plaintiff "posed an immediate threat to the safety of the officers or others." *Mattos v. Agarano*, 661

F.3d 433, 441 (9th Cir. 2011). A suspect may pose a threat of serious physical harm "if 'there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm,' or if the suspect threatens the officer or others with a weapon capable of inflicting such harm." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (quoting *Tennessee v. Garner*, 471 U.S. at 1, 11 (1985)).

"[G]eneralized" safety concerns, "standing alone, cannot justify the use of force." *Winterrowd v. Nelson*, 480 F.3d 1181, 1185 (9th Cir. 2007). "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citation and quotation omitted). But the Fourth Amendment does not require a police officer to be "omniscien[t], and absolute certainty of harm need not precede [an officer's] act of self-protection." *Wilkinson v. Torres*, 610 F.3d 546, 553 (9th Cir. 2010) (citation and internal question mark omitted). The inquiry is not what an officer perceived; rather, it is "whether a reasonable officer would have or should have accurately perceived that fact." *Nehad*, 929 F.3d at 1133 (citing *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011)). In other words, the objective reasonableness of Defendants' response is not dependent upon their subjective perceptions. *Id.* at 1133 n.5 ("We did not suggest . . . that the objective reasonableness of an officer's response is dependent upon that officer's subjective perceptions"). "The key question, then, is whether [Defendants] had an objectively reasonable basis for believing that [Plaintiff] posed a threat of serious physical harm, either to [Defendants] or to others." *Orn*, 949 F.3d at 1174 (citing *Ryburn v. Huff*, 565 U.S. 469, 474 (2012) (per curiam)).

Defendants contend that Plaintiff's movements "were not consistent with a person attempting to submit to arrest, but rather with someone preparing to resist or strike." (Doc. 33 at 7). Defendants cite Plaintiff's purportedly "defensive" or "fighting" posture. (*Id.* at 9). The video evidence shows Plaintiff was told to get on the ground three times before Defendant Selvius pushed him to the ground. (Selvius at 1:09–1:20). The video evidence also shows that Defendant McKnight told Plaintiff a fourth time to get on the ground when

Plaintiff tried to get back up after he was on the ground. (*Id.*). In addition to not obeying commands to get on the ground, the video shows Plaintiff bouncing on the balls of his feet, moving his hands to the front of his pants where he is wearing a medium sized waist bag, and moving backwards. (*Id.*). Plaintiff also has something in at least one of his hands that cannot be identified. (*Id.*). Both Defendants aver, "[Plaintiff] had objects in both his hands that due to the lighting conditions I was not able to identify prior to making contact with him. As [Plaintiff] was backing away, I believed he was reaching for a handgun." (McKnight Decl. ¶¶7-9; Selvius Decl. ¶¶ 7-9). Additionally, McKnight announces they are "Phoenix Police" before Plaintiff is on the ground. (McKnight at 1:12–1:14). Both officers were also wearing vests that said "POLICE" on them. Plaintiff's failure to comply with commands and fighting posture, coupled with Plaintiff's statement that "I didn't do nothing" (which verbally suggested Plaintiff opposed the officer's actions and would not comply), all of which followed Plaintiff's suspected felony behavior of selling drugs, gave Defendants an objectively reasonable basis for believing Plaintiff posed a threat. Therefore, Defendants' actions in bringing Plaintiff to the ground did not constitute excessive force.

Thus, the remaining question is whether Defendant McKnight's punch (or punches as alleged by Plaintiff) to Plaintiff's face creates a question of fact for trial on excessive force. As discussed above, neither video shows a punch; however, Defendant McKnight admits he punched Plaintiff once in the face. In his Incident Report, Defendant McKnight wrote that when he struck Plaintiff in the face with a closed fist, Plaintiff's back was toward McKnight, and Plaintiff was on the ground. Defendant McKnight's report states that Plaintiff raised his left arm and his right leg in a kicking motion towards Defendant Selvius. (Doc. 31 at 30). The video evidence corroborates Defendant McKnight's report and shows Plaintiff raising his leg and arm. (McKnight 1:12-1:15; Selvius 1:14-1:15). While the video cannot establish Plaintiff's motivation, a reasonable officer could conclude that Plaintiff's behavior posed an ongoing threat to the officers' safety. Additionally, the video evidence

shows Plaintiff attempting to get up after he is on the ground. (Selvius 1:13-1:17). Thus, further force to stop Plaintiff from getting up and leaving was not excessive.

Regarding Plaintiff's claim that he was hit multiple times, the video evidence refutes his version of the facts. The entire incident from when Defendant McKnight arrives at Plaintiff's location to when Plaintiff is handcuffed was 10 seconds. (McKnight at 1:15–1:25). It is all recorded on two videos. The videos refute that there was time for Defendant McKnight to punch Plaintiff multiple times, and the video refutes that multiple punches occurred. Plaintiff does not claim these punches occurred after he was subdued (nor does the video show any punches after Plaintiff was handcuffed). Thus, the videos clearly refute that multiple punches occurred in this 10-second timeframe.

As a result, this most important *Graham* factor weighs in favor of Defendants.

**c. Resisting or Attempting Escape**

The Ninth Circuit Court of Appeals has "long distinguished between passive and active resistance." *Rice*, 989 F.3d at 1123. Resistance "should not be understood as a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan*, 630 F.3d at 830. "[T]he level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.* "[P]urely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Id.* A "failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012).

The parties dispute whether Plaintiff resisted at all or whether he passively or actively resisted. Plaintiff argues he did not resist at all and instead was startled by Defendants jumping out of their unmarked vehicle and immediately yelling commands at him. Defendants each aver, "After instructing [Plaintiff] to get on the ground multiple

times," Defendant Selvius pushed Plaintiff "off balance to get him on the ground," and after he fell to the ground, he "attempted to get up." (McKnight Decl. ¶¶10-11; Selvius Decl. ¶¶ 10-11.) Plaintiff maintains that Defendants did not give him a chance to comply with their commands and immediately used force against him. Defendants contend that Plaintiff's "body language, positioning, and refusal to get on the ground conveyed resistance rather than compliance," and they therefore "were not required to wait passively or expose themselves to potential harm." (Doc. 33 at 9.)

The video evidence corroborates Defendants' facts. Specifically, the video evidence shows that despite Defendants wearing vests that said "police" and instructing Plaintiff three times to get on the ground, Plaintiff neither complied nor acted in a way that was consistent with compliance. (Selvius 1:09-1:19). For example, Plaintiff did not stop moving and instead rapidly backed away from Defendants while bouncing on the balls of his feet facing Defendant Selvius as if positioned for a fight. (*Id.*). Plaintiff did not put his hands where they were visible but instead kept them fisted and moved them rapidly to his waist bag. Plaintiff did not drop the item or items in his fist. (*Id.*). Plaintiff did not verbally agree to comply. Instead, Plaintiff said "I didn't do nothing" which a reasonable officer could interpret as a statement that Plaintiff believed he was not required to comply; and, therefore, he would not comply. (*Id.*). All of Plaintiff's actions on the video are that of someone who was resisting but was ultimately overpowered. (*Id.*).

Plaintiff's primary argument that he was not resisting arrest is that he was not charged with resisting arrest. (Doc. 31). However, the fact that Plaintiff was not charged with the crime of resisting arrest does not contradict the video evidence which shows that Plaintiff was resisting.

Accordingly, this factor also weighs in favor of Defendants.

**3. Other Factors**

As noted, the Ninth Circuit Court of Appeals has identified other factors that courts should consider in determining whether the force used was reasonable and necessary, including whether less intrusive alternatives were available to law enforcement, whether

the suspect was given proper warnings before force was used, and whether officers identified themselves as law enforcement officers. *Sabbe*, 84 F.4th at 822; *Nehad*, 929 F.3d at 1138.

Defendants argue, in essence, that no reasonable jury could conclude that Plaintiff did not know Defendants were police officers because they were wearing tactical vests with "Police" written in bold yellow letters, and Plaintiff admits that he "heard them yelling commands as they exited their vehicles." (Doc. 33 at 3). As noted above, the video evidence does not show Defendant Selvius identify himself as a law enforcement officer. However, the McKnight video shows that Defendant McKnight identified them as "Phoenix police" before Plaintiff was on the ground. (McKnight at 1:12–1:14). Defendant Selvius yelled at Plaintiff several times to get on the ground before he shoved Plaintiff. (Selvius at 1:09–1:20). Plaintiff asserts he did not quickly react to Defendant Selvius' commands to get on the ground because he was confused. (Doc. 31 at 9). However, Plaintiff's claim that he did not understand Defendant Selvius is contradicted by the video evidence. Specifically, Defendant Selvius can clearly be heard saying "get on the ground" and Plaintiff's response can also clearly be heard. (*Id.*) Thus, the video establishes that Plaintiff and Defendant Selvius were within hearing distance of each other. Additionally, after Defendant Selvius says "get on the ground", Plaintiff immediately responds "I didn't do nothing." (*Id.*). Plaintiff responding to the command with an explanation of why he believes he need not comply shows Plaintiff heard the command. Further, Plaintiff's statement that "I didn't do nothing" is consistent with Plaintiff recognizing that these were police officers who were trying to detain him; thus, the video undercuts Plaintiff's testimony that he did not know who the Defendants were. (Doc. 31 at 8).

With respect to less restrictive alternatives, as stated above, officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Glenn*, 673 F.3d at 876 (citation omitted). However, "police are 'required to consider [w]hat other tactics if any were available,'" and if there were "clear, reasonable and less intrusive alternatives" to the

force employed, that "militate[s] against finding [the] use of force reasonable." *Bryan*, 630 F.3d at 831 (citation omitted). Plaintiff contends Defendants had "ample opportunity" to use a Taser rather than shove him to the ground and punch him. But as Defendants point out, there is no evidence that they were equipped with Tasers, and in any event, Tasers are capable of inflicting significant pain and injury. (Doc. 33 at 8.) The Court finds that, in this very brief encounter during an exigent situation wherein Plaintiff was backing up and seemingly intending to leave or fight, the officers did not have "ample opportunity" to consider other means of detaining Plaintiff and acted within the range of reasonable conduct.

**4. Totality of the Circumstances**

Finally, the Court must balance the force used against the need for such force to determine whether the force used was "greater than reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (quoting *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002)). "Underlying *Graham*'s objective-reasonableness test is the clear principle that the force used to make an arrest must be balanced against the need for force: it is the *need* for force which is at the heart of the *Graham* factors." *Blankenhorn v. City of Orange*, 485 F.3d 463 at 480 (9th Cir. 2007) (cleaned up). "Determining whether the force used to effect a particular seizure is reasonable requires balancing of the individual's Fourth Amendment interests against the relevant government interests." *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017) (cleaned up). "The operative question in excessive force cases is whether the totality of the circumstances justifies a particular sort of search or seizure." *Id.* (cleaned up).

On balance, given that Defendants believed Plaintiff was engaged in felony drug sales, Plaintiff was resisting by backing up, not complying with commands, had an unidentified object in one of his hands, and reached toward his waist bag, the amount of force used of taking Plaintiff to the grounds and hitting him once to stop him from trying to get up was not excessive. Accordingly, Defendants are entitled to summary judgment.

**V. Qualified Immunity**

As discussed above, the Court has concluded that the video evidence established undisputed facts that showed, as a matter of law, Defendants were entitled to summary judgment. *Scott*, 550 U.S. at 381 n.8 (if the relevant facts are undisputed, the question of whether an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law"). Nonetheless, the Court will consider Defendants' alternative argument that they are entitled to qualified immunity.

**A. Legal Standard**

Under the doctrine of qualified immunity, state officials are not liable under § 1983 "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Qualified immunity "attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017)). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Moore v. Garnand*, 83 F.4th 743, 750 (9th Cir. 2023) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (a right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law")

(citing *White*, 580 U.S. at 79). This standard "protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743. "The qualified immunity analysis . . . is limited to the facts that were knowable to the defendant officers at the time they engaged in the conduct in question." *Spencer v. Pew*, 117 F.4th 1130, 1139 (9th Cir. 2024) (quoting *Hernandez v. Mesa*, 582 U.S. 548, 554 (2017)) (internal quotation marks omitted). The Court must "view the facts as an officer would have encountered them [at the time of the arrest], not as an ex post facto critic dissecting every potential variance under a magnifying glass." *Monzon v. City of Murrieta*, 978 F.3d 1150, 1157 (9th Cir. 2020).

"The plaintiff bears the burden of pointing to prior case law that articulates a constitutional rule specific enough to alert these officers in this case that their particular conduct was unlawful." *Hughes*, 31 F.4th at 1223; *see also Kisela*, 584 U.S. at 104; *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) ("Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* deputies in *this* case that *their particular conduct* was unlawful.") (emphasis in original). "There is no analogous burden on § 1983 defendants to find factually on-point cases clearly establishing the lawfulness of an officer's actions. Nor must § 1983 defendants come forward with precedent showing that the unlawfulness of their conduct was not clearly established." *Hopson v. Alexander*, 71 F.4th 692, 708 (9th Cir. 2023).

Although a case need not be directly on point, existing precedent must "place[] the statutory or constitutional question beyond debate." *Waid v. County of Lyon*, 87 F.4th 383, 387 (9th Cir. 2023) (quoting *al-Kidd*, 563 U.S. at 741). The prior precedent must be "controlling"—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a "consensus" of courts outside the relevant jurisdiction. *Sharp*, 871 F.3d at 911. "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Waid*, 87 F.4th at 387 (internal quotation marks and citations omitted). "Cases cast at a high level of

generality are unlikely to establish rights with the requisite specificity." *Id.* at 388 (internal quotation marks omitted). "While a case addressing general principles may clearly establish a right in an obvious case, such obvious cases are rare." *Id.* (citations and quotation marks omitted). "Plaintiff[] must either explain why [his] case is obvious under existing general principles or, more commonly, show specific cases that control or reflect a consensus of non-binding authorities in similar situations." *Id.* (citing *Hopson*, 71 F.4th at 697).

At summary judgment, an officer may be denied qualified immunity "only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, and (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation." *Torres*, 648 F.3d at 1123.

**B. Parties' Arguments**

Defendants argue they are entitled to qualified immunity because "[i]t is not 'beyond debate' that their "specific actions . . . constituted excessive force under the Fourth Amendment." (Doc. 26 at 13). Defendants contend that Plaintiff cannot "identify any precedent that would have put every reasonable officer on notice that this degree of force, in response to perceived resistance during an arrest, was unconstitutional"; rather, Defendants assert, a reasonable officer in their position "would not have understood that pushing Plaintiff to the ground and striking him once during an attempt to regain control violated clearly established law." (*Id.*).

Although Plaintiff has a heading in his response titled "Defendants are not entitled to Qualified Immunity" (Doc. 31 at 13), Plaintiff does not substantively address Defendants' qualified immunity arguments in his Response. Instead, Plaintiff argues *Monell* liability, which is not at issue on summary judgment.

**C. Discussion**

First, for the reasons stated above, the Court finds Defendants did not violate Plaintiff's rights. Alternatively, the Court finds that a reasonable officer would not have

been on notice that the force used in this case over the course of less than 20 seconds to subdue a resisting suspect violated the suspect's constitutional rights.

As stated above, Plaintiff failed to address Defendants' arguments regarding qualified immunity. Plaintiff, therefore, failed to meet his burden to point to prior case law that "articulates a constitutional rule specific enough to alert" Defendants "that their particular conduct was unlawful." Defendants argue that Plaintiff's failure to meet his burden entitles them to qualified immunity. (Doc. 33 at 11).

Generally, if a party fails to meet their burden on summary judgment, the Court should grant summary judgment to their adversary. *See Nissan Fire*, 210 F.3d at 1103 ("If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."). However, this Court cannot grant summary judgment as a sanction for a party's failure to respond. *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013). These rules are difficult to reconcile when a party responds to a motion, but does not respond to a particular argument within the motion.

On the merits, this Court finds Plaintiff failed to show the law was clearly established; specifically, Plaintiff failed to identify a case or statute that establishes that shoving to the ground and hitting a suspect, who is resisting, over the course of less than 20 seconds, is excessive. The Court has not robustly researched this issue on Plaintiff's behalf to identify every case that might support his position. *See Rasberry v. Garcia*, 448 F.3d 1150, 1153 (9th Cir. 2006); *Pliler v. Ford*, 542 U.S. 225, 231 (2004) ("District judges have no obligation to act as counsel or paralegal to *pro se* litigants."). Nonetheless, based on the Court's limited research, the Court did not discover any cases that would make it "obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *See Shafer*, 868 F.3d at 1117. Because Plaintiff has failed to show that the law was clearly established such that it would put a reasonable officer on notice that the amount of force used in this case was excessive, and the Court did not find any cases clearly establishing that the force in this case was excessive, the officers are

entitled to qualified immunity. *See, e.g., Riggs v. Mariposa Cnty.*, No. 1:23-CV-00710-KES-SAB, 2025 WL 3187323, at *17 (E.D. Cal. Nov. 14, 2025) ([Plaintiff] has failed to meet his burden to show that the law was clearly established with respect to his…claims…. Accordingly, [Defendant] is entitled to qualified immunity on those claims.”).

Based on the foregoing,

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. 26).

(2) Defendants' Motion for Summary Judgment (Doc. 26) is granted; the Clerk of the Court is directed to enter judgment accordingly and close this case.

Dated this 4th day of September, 2026.

James A. Teilborg
Senior United States District Judge